## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| ADAM LAMBERT, | ) |
|      Plaintiff, | )   **CIVIL COMPLAINT** |
| | ) |
|  v. | ) |
| | )   Case No. 2:22-cv-121 |
| FEDERAL ADJUSTMENT BUREAU, INC. d/b/a "FABCO", | ) |
| | ) |
| 5812 INVESTMENT GROUP, LLC, | ) |
| | ) |
| NEW LIFE MULTI-FAMILY MANAGEMENT, LLC, | ) |
| | ) |
|   and | )   **JURY DEMAND** |
| | ) |
| EXPERIAN INFORMATION SOLUTIONS, INC., | ) |
| | ) |
|      Defendants. | ) |

## COMPLAINT

Now comes ADAM LAMBERT ("Plaintiff"), complaining as to FEDERAL ADJUSTMENT BUREAU, INC. d/b/a "FABCO" ("FABCO"); 5812 INVESTMENT GROUP, LLC ("5812 Investment"); NEW LIFE MULTI-FAMILY MANAGEMENT, LLC ("New Life"); and EXPERIAN INFORMATION SOLUTIONS, INC. ("Experian," and collectively, "Defendants"), as follows:

### NATURE OF THE ACTION

1.    Plaintiff brings this action pursuant to the Fair Credit Reporting Act ("FCRA") under 15 U.S.C. 1691 *et seq.*; Fair Debt Collection Practices Act ("FDCPA") under 15 U.S.C. § 1692 *et seq.*; the Ohio Landlords and Tenants Act under R.C. 5321.01 *et seq.*; and Ohio common law.

[ 1 ]

JURISDICTION AND VENUE

2.    This action arises under the FCRA and FDCPA.  Subject matter jurisdiction is conferred upon this Court by 15 U.S.C. §§ 1681 and 1692, as well as 28 U.S.C. §§ 1331 and 1337, as the action arises under the laws of the United States.

3.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) as the primary Defendants reside within this district and the acts and omissions giving rise to the causes of action occurred primarily within this district.

PARTIES

4.    Plaintiff is a natural person residing in the State of South Carolina.

5.    Defendant Federal Adjustment Bureau, Inc. d/b/a FABCO ("FABCO") is an Ohio corporation with its principal place of business at 4640 Executive Dr., Columbus, OH 43220.  It may be served care of E. Marlene Mahoney at that location.

6.    FABCO operates as a third-party debt collector on behalf of landlords. *About Us*, FABCO (*last visited* July 21, 2021), *available at* https://fabcogroup.com/ ("Our specialization in rental debts and dedicated staff of collectors has helped establish FABCO as an industry-leading debt collection agency.").

7.    FABCO also operates as a consumer reporting agency specializing in consumer reports tailored to the needs of landlords.  *About Us*, FABCO (*last visited* July 21, 2021), *available at* https://fabcogroup.com/ ("Our detailed, three-part report goes above and beyond the average credit and criminal check, providing landlords with information specific to the applicant's rental background, including eviction filings, rental collections, address histories, and inquiries from other landlords.").

[ 2 ]

8.      FABCO advertises that its reports "help other landlords avoid renting to bad tenants as well as encourage payments to get the collection off of the applicant's report."  *Collections Packet*, FABCO (*last visited* January 5, 2022), *available at* https://fabcogroup.com/wp-content/uploads/2021/11/Collections-Packet.pdf.

9.      Although FABCO notionally operates nationwide, its home, and its primary focus, is Central Ohio.  Within Central Ohio, nearly every major landlord—and many minor ones—employs FABCO's services both in evaluating potential new renters and in recording and collecting outstanding balances allegedly owed by prior renters.

10.      As a result, any balance allegedly owed on move-out to a major landlord in Central Ohio quickly becomes a both a debt that FABCO will endeavor to collect from the consumer and a negative remark on FABCO's report for the consumer.

11.      Such a negative remark, because of FABCO's popularity among Central Ohio landlords, operates as a near-total bar to the consumer's ability to find housing in any multi-family development in Central Ohio.

12.      FABCO also reports negative remarks to one or more of the Big Three credit reporting agencies, damaging consumers' ability to find housing nationwide.

13.      Defendant 5812 Investment Group, LLC ("5812 Investment") is an Ohio limited liability company with its principal place of business in this District.  It may be served via its registered agent, Corporation Service Company at 50 W. Broad St., Ste. 1330, Columbus, OH 43215.

14.      5812 Investment owns and operates the Lake Eden Townhomes and Apartments multifamily development at 5179 Dempster Dr., Columbus, OH 43228.

[ 3 ]

15.     5812 Investment "is one of the largest property management companies in Central Ohio and currently manages communities in the Columbus and Dayton, Ohio area." *About Us*, 5812 Investment Group, LLC (*last visited* July 21, 2021), *available at* https://www.live5812.com/404.aspx.

16.     5812 Investment, as a matter of policy, places with FABCO for reporting and collection most or all outstanding balances that it alleges are owed to it by former tenants, and it employs FABCO reports in making its own prospective rental decisions.

17.     Defendant New Life Multi-Family Management, LLC ("New Life") is a Minnesota limited liability company that may be served via its registered agent, Corporation Service Company, at 50 W. Broad St., Ste. 1330, Columbus, OH 43215.

18.     Until 2019, New Life owned and operated the Lake Eden Townhomes and Apartments multifamily housing development located at 5179 Dempster Dr., Columbus, OH 43228.

19.     On December 3, 2019, 5812 Investment represented to the residents of Lake Eden Townhomes and Apartments, including Plaintiff, that "New Life Multi Family Management is now 5812 Investment Group. . . . Please note, nothing has changed with your lease contract or your points of contact."

20.     On information and belief, at some point between April and December of 2019, New Life transferred all of its assets and all of its personnel to 5812 Investment.

21.     On information and belief, at that time 5812 Investment also formally assumed New Life's debts.

[ 4 ]

22.     In the alternative, at that time New Life de facto merged into 5812 Investment which operates as a mere continuation of New Life.

23.     Defendants acted through their agents, employees, officers, members, directors, heirs, successors, assigns, principles, trustees, sureties, subrogees, representatives, and insurers at all times relevant to the instant action.

### BACKGROUND – IN THE BEGINNING

24.     On June 14, 2019, Plaintiff Adam Lambert and his significant other of more than a year, Amber Deason, entered into an agreement with Defendant New Life to lease a unit in the Lake Eden Townhomes and Apartments multifamily housing development ("Lake Eden") for themselves and Ms. Deason's three minor children.

25.     Plaintiff and Ms. Deason agreed to provide a security deposit of $399.00 and to pay rent at a monthly rate of $911.00, discounted by $100 per month as a "concession," for the period from June 14, 2019, through June 30, 2020.

26.     Plaintiff and Ms. Deason thus agreed to pay a total of $460 for the second half of June, 2019, and $811 per month thereafter, for a total of $10,192.

27.     Plaintiff and Ms. Deason further agreed to pay for repairs of damage caused by them or their guests within thirty (30) days.

28.     In return, New Life agreed to provide Plaintiff his family with the use of the unit located at 5240 Dempster Dr., Apt. D, Columbus, OH 43228 (the "Unit").

29.     New Life further agreed to "[m]ake all repairs and do whatever is reasonably necessary to put and keep the Premises in a fit and habitable condition."

30.     For the first few months at Lake Eden, the longstanding relationship between Plaintiff and Ms. Deason was healthy and devoid of major conflict.

31.     During this time Plaintiff and Ms. Deason generally had sufficient joint income to make ends meet.  Plaintiff's employment provided most of that joint income.

32.     Both Plaintiff and Ms. Deason expected their relationship to be permanent, and Ms. Deason's children referred to Plaintiff as "Daddy."

BACKGROUND – PARADISE LOST

33.     Things began to go south in August.  At some point prior to August 27, 2019, Plaintiff and Ms. Deason began to suspect that the Unit was infested by bed bugs and/or cockroaches.

34.     On or shortly before August 27, 2019, Plaintiff went to the Lake Eden leasing office and orally requested that Lake Eden's maintenance staff confirm and treat the suspected infestation.

35.     The Unit was, in fact, infested by bed bugs.

36.     Such bed bug infestations are not unusual at Lake Eden.  Out of twenty-six reviews for the complex on "apartments.com," four mention bed bugs, and a fifth mentions unspecified bugs that "never go away" despite complaints to the property management.

37.     Neither Plaintiff nor any member or guest of the household brought the bed bugs into the Unit.

38.     On information and belief, the bed bugs were present when Plaintiff and Ms. Deason arrived or else spread to the Unit from an adjoining unit.

39.     Plaintiff and Ms. Deason were not responsible for the bed bug infestation in their Unit, and it was therefore the responsibility of New Life and 5812 Investment to handle the infestation.

40.     Lake Eden did not then provide a means by which residents could submit their own maintenance tickets, online or otherwise, forcing Plaintiff and Ms. Deason to rely on the leasing office staff to create maintenance tickets.

41.     Alternatively, if Lake Eden then provided a means by which residents could submit their own maintenance tickets, online or otherwise, then Plaintiff and Ms. Deason were unaware of or unable to access such means and therefore remained at the mercy of the leasing office staff.

42.     It took nearly a month of requests by Plaintiff and Ms. Deason before Lake Eden's leasing office staff scheduled an inspection for a time compatible with the couple's work and childcare schedules and for which the couple would have at least twenty-four hours' notice to prepare the Unit.

43.     When the inspection finally occurred on September 26, 2019, Lake Eden maintenance staff marked a maintenance ticket labelled "Bed Bugs" as completed and with the contemporaneous note: "Unit needs heat treatment.  Live activity found in all bedrooms.  Completed by Parrish."

44.     Ms. Deason received an email noting that the maintenance ticket labelled "Bed Bugs" had been completed, though it did not convey the maintenance worker's notes.

[ 7 ]

45.     Unfortunately, by this point the Lake Eden leasing office staff, and especially a female employee hereinafter referred to as Jane Doe 1, had taken a strong dislike to Plaintiff and Ms. Deason.

46.     When Plaintiff and Ms. Deason requested that the Lake Eden leasing office staff create a maintenance ticket and schedule a heat treatment for the now-confirmed bed bug infestation, the staff asserted that Plaintiff and Ms. Deason were the cause of the bed bugs and would need to pay for the heat treatment.

47.     Plaintiff and Ms. Deason stated at that point that they were willing to pay, but the Lake Eden leasing office staff failed to submit a maintenance ticket, and no action was taken to remedy the problem.

48.     Over the next two weeks, Plaintiff and Ms. Deason contacted the leasing office staff approximately ten times asking that they schedule a treatment for the bed bug problem.

49.     Each time they contacted the leasing office about the bed bug problem, they were told that Lake Eden was shorthanded on maintenance staff.

50.     Soon thereafter, Plaintiff applied to an open position on the Lake Eden maintenance staff, but despite his experience in the field his application was rejected without an interview.

51.     Plaintiff also requested permission to hire his own exterminator, potentially at his and Ms. Deason's expense, to handle the bed bug problem, going so far as to obtain a quote for the service.

[ 8 ]

52. Plaintiff was told that no outside exterminators or maintenance persons were permitted under his lease, and that hiring an outside exterminator would result in eviction.

53. The Lake Eden leasing office staff also barred Plaintiff and Ms. Deason from entering the leasing office for the stated reason that they might bring bed bugs into the office.

54. For the next three months, Plaintiff and Ms. Deason continued to ask the leasing office to handle the bed bug problem at least once a week, but they were continually told that Lake Eden was shorthanded on maintenance.

55. During this period, Plaintiff and Ms. Deason tried everything they could think of to solve the bed bug problem.

56. Plaintiff attempted to combat the infestation himself using bug bombs and other insecticides.

57. Plaintiff contacted several lawyers seeking assistance, but he was unable to secure representation.

58. Despite these efforts, the bed bug infestation grew ever more serious.

59. Plaintiff, Ms. Deason, and the children regularly awoke covered in irritating and painful bites that caused stress, increased conflict within the household, hampered the children's performance at school, and otherwise significantly impacted Plaintiff's and his family's enjoyment of life.

60.     At some point in November or December of 2019, Plaintiff was told by his boss, who had spotted bed bugs on Plaintiff's jacket, that he needed to go home and could not come in again until he took care of the bed bug problem.

61.     Still, Lake Eden staff refused to do anything about the bed bug infestation.

62.     As a result, Plaintiff was constructively terminated from his employment in about December of 2019.

63.     At some point prior to January 13, 2020, Plaintiff made contact with the Legal Aid Society of Columbus, who put Plaintiff into contact with City of Columbus Code Enforcement.

64.     On or about January 12, 2020, Plaintiff informed the leasing office staff that he would be contacting Code Enforcement.

65.     On January 14, 2020, at 8:32 A.M., Isiah Wheeler from Columbus Code Enforcement sent an email to Laquisha Dukes, the "Community Manager" for Lake Eden, stating that he had scheduled an inspection of the Unit for January 16 in relation to a bed bug complaint.

66.     On January 14, 2020, at 10:55 A.M., Ms. Dukes responded to Mr. Wheeler's email stating that "they are actually already scheduled for a heat treatment on that day. I spoke with the resident last week in regards to this issue.  Thank you and have a great day."

67.     On January 14, 2020, at 11:28 A.M., Ms. Deason, received an email informing her that a heat treatment of the Unit had been scheduled for January 16, 2020.

68.     In the evening of January 15, Plaintiff received a paper copy of a notice of the upcoming heat treatment and brought it to Ms. Deason's attention.

69.     The paper notice represented the first time that Plaintiff and Ms. Deason received actual notice that a heat treatment of the Unit would occur.

70.     By that date, one hundred and forty (140) days had passed since Plaintiff and/or Ms. Deason informed Lake Eden's property management that the Unit was infested with insects, and one hundred and ten (110) days had passed since Lake Eden's maintenance team had confirmed the presence of bed bugs.

71.     On information and belief, Lake Eden property management decided to deal with the bedbug problem in the Unit only **after** realizing that Plaintiff intended to or had already contacted Code Enforcement.

72.     After receiving Ms. Dukes's email claiming that a heat treatment was already scheduled, Mr. Wheeler rescheduled the inspection for January 21, 2020.

73.     On January 16, 2020, Lake Eden maintenance staff and/or contractors performed a heat treatment of the Unit.

74.     The worker(s) who performed the heat treatment marked a maintenance ticket labelled "Confirmed Bed Bugs" as completed and with the contemporaneous note: "held unit between 130-140 degrees for 3 hours. sprayed entire unit trim. dusted entire unit outlets."

75.     The worker(s) did not note any issues with the preparation of the Unit.

[ 11 ]

76.     Ms. Deason received an email noting that the maintenance ticket labelled "Confirmed Bed Bugs" had been completed, though it did not convey the maintenance worker's notes.

77.     Unfortunately, the first heat treatment of the Unit proved unsuccessful. Plaintiff and his family continued to suffer from constant bites and the other negative effects attendant on bed bug infestations.

78.     On January 21, 2020, Mr. Wheeler performed an inspection of the Unit and confirmed the ongoing presence of live bed bugs in both of the Unit's bedrooms.

79.     On January 23, 2020, Lake Eden maintenance staff performed another inspection.  The worker who completed the inspection marked a maintenance ticket labelled "Post Inspection Follow Up" as completed and with the contemporaneous note: "Unit needs heat treatment.  High live activity found."

80.     Ms. Deason received an email noting that the maintenance ticket labelled "Post Inspection Follow Up" had been completed, though it did not convey the maintenance worker's notes.

81.     On February 7, 2020, Lake Eden maintenance staff performed a second heat treatment of the Unit.

82.     This second heat treatment was performed in an unworkmanlike manner. Lake Eden maintenance staff placed a heat pipe through the window and turned on the heater, but they did little or nothing else.

83.     At approximately 4:08 PM on February 7, 2020, Lake Eden maintenance staff marked the maintenance ticket "Confirmed Bed Bugs" as completed.

[ 12 ]

84.     Ms. Deason received an email noting that the maintenance ticket labelled "Confirmed Bed Bugs" had been completed, though it did not convey the maintenance worker's notes.

85.     During Plaintiff's interactions with Defendant FABCO, discussed below, Plaintiff received copies of the contemporaneous notes taken by maintenance staff on all bed bug-related completed tickets *except* the ticket completed on February 7, 2020.

86.     On February 13, 2020, Lake Eden maintenance staff completed another inspection of the Unit.  At 2:54 PM on that date, the maintenance ticket for the first "Post Inspection" was marked completed with the note:  "Unit needs heat treatment. Live activity found.  Unit not prepared for chemical application."

87.     The notice Plaintiff and Ms. Deason received on February 12 regarding the February 13 inspection had explicitly stated that no preparation for chemical application was required.

88.     Ms. Deason received an immediate email noting that the maintenance ticket labelled "Post Inspection" had been completed, though it did not convey the maintenance worker's notes.

89.     Also on February 13, 2020, at 4:14 PM—after the follow-up inspection was completed—Lake Eden maintenance staff again marked the ticket labelled "Confirmed Bed Bugs" completed with the note:  "Held unit temp between 120-140 degrees for 4 hours.  Unit was not fully prepared.  Allowed resident to dump totes that would potentially cause further issue.  Not all totes were dumped causing cold spots the head could not fully penetrate.  Post inspections are scheduled.  Completed by Parrish."

[ 13 ]

90.     Unlike the contemporaneous notes taken on February 7, 2020, these post-hoc rationalizations were provided to Plaintiff by FABCO.

91.     Ms Deason received an immediate email noting that the maintenance ticket labelled "Confirmed Bed Bugs" had been completed, though it did not convey the maintenance worker's notes.

92.     At some point between February 12 and February 16, 2020.  Plaintiff and Ms. Deason received a note on the Unit's door stating that there was an unpaid balance of $645.00 due on their account.  The note did not explain further.

93.     Plaintiff and Ms. Deason went to the leasing office to request an explanation, at which time they learned that they were being required to pay for the second bed bug heat treatment.

94.     Plaintiff and Ms. Deason did not agree that the charge was legitimate.

95.     Plaintiff, Ms. Deason, and another Lake Eden employee referred to hereinafter as Jane Doe 2 discussed the matter, and all parties agreed to extend the lease's thirty (30) day payment period for repairs to forty-five (45) days before rent for the Unit would be considered late.

96.     At some point prior to March 6, 2021, Plaintiff and Ms. Deason attempted to pay their rent for March 2020.

97.     Contrary to both the language of the lease and her prior representation, Jane Doe 2 informed Plaintiff and Ms. Deason that they would not be permitted to make partial payment of their rent.  Jane Doe 2 stated that because the $645 had been added to

their rent, Plaintiff and Ms. Deason were required to pay both their full rent and the $645 cost of the heat treatment or face eviction for nonpayment of rent.

98.     On or about March 6, 2020, a Lake Eden employee knocked on the Unit's door.  Ms. Deason's eldest daughter Neveah, who was home alone at the time, answered and was handed an eviction notice.

99.     When Plaintiff and Ms. Deason got home from work, Neveah was terrified and asked why they were losing their home, what they were going to do, and where they were going to go.

100.     The constant discomfort and stress caused by the bed bugs, the financial hardships caused by Plaintiff's bed bug-related unemployment, and the resultant petty conflicts had already badly strained the relationship between Plaintiff and Ms. Deason.

101.     After the couple consoled Neveah and the other children upset by her distress, Ms. Deason told Plaintiff words to the effect of, "Once we're done with this apartment, we're done."

102.     On March 12, 2020, Plaintiff and Ms. Deason turned in their keys and vacated the Unit.

103.     Since that day, Plaintiff has not seen Ms. Deason or her children, whom he considered practically his own children after knowing them for more than seven years. He continues to suffer serious emotional distress from this separation.

104.     Within hours of Plaintiff and Ms. Deason vacating the unit, Ms. Dukes contacted Code Enforcement and asked them to cancel any proceedings because the tenant had moved out.

## BACKGROUND – FOR EVER FALL'N

105.     Because Plaintiff was forced to move out of the Unit by Ms. Dukes's decision to accelerate a payment's agreed due date by 30 days, he did not have new housing arranged and was forced to temporarily live in a car.

106.     Plaintiff was first able to apply for new housing in about mid-May of 2020.

107.     Plaintiff's application was rejected.

108.     Plaintiff was informed he was rejected based upon a consumer credit report or consumer credit line entry created or submitted by Defendant FABCO.

109.     Plaintiff has subsequently applied for new housing at least five additional times.

110.     Plaintiff has expended at least $400 on unsuccessful housing applications.

111.     To date, Plaintiff still has not secured new housing.  He has been forced to spend the past year and a half couch surfing, living in his car, living with relatives, and for six months living in a shed.  This has placed great strain on several important personal relationships and has caused Plaintiff shame, embarrassment, and stress.  It has also complicated his attempts to seek additional employment.

112.     On February 5, 2021, Plaintiff sent a letter to Defendant FABCO requesting a copy of Plaintiff's consumer credit report as maintained by FABCO.

113.     On or about February 8, 2021, FABCO provided a copy of its report regarding Plaintiff.

114.    That report stated, *inter alia*, that Plaintiff owed $3,771.00 in unpaid rent, $1,433.00 in refurbishment costs, and $75.00 in late fees for the Lake Eden Unit, resulting in a total amount due of $4,880 after application of a $399.00 deposit.

115.    FABCO also provided a copy of Defendant 5812 Investment's "Final account statement – Revised" (hereinafter the "First Statement") for Plaintiff, dated June 1, 2020, as well as copies of the relevant lease and several addendums thereto.

116.    The First Statement stated that Plaintiff owed, *inter alia*, approximately $135 in water and gas bills, $294 in prorated rent for March 2020 plus $75 in late fees for the same, a total of $638 for various repairs, $645 for the second heat treatment plus $15 for the follow-up inspection, $2,577 in additional rent for the remaining months on the lease, and an unexplained $900 for "Concession Chargeback."

117.    After deduction of a $399 security deposit, the First Statement listed a "Final Account [B]alance" of $4,880.50.

118.    FABCO, as a credit reporting and debt collection agency focusing on rental collections in central Ohio, knew or should have known that most or all of these charges were inaccurate and impermissible for, *inter alia*, the reasons laid out below.

119.    For one example, FABCO was aware that most units left vacant by lease breaks are re-rented before the full lease period elapses.

120.    From at least June 30, 2020, onwards, therefore, FABCO was aware that the rent-after move-out figure was very likely inaccurate.

121.    On information and belief, between the date 5812 Investment listed Plaintiff's purported debt with FABCO and February 18, 2021, FABCO never requested

[ 17 ]

that 5812 Investment state whether the Unit had been re-rented prior to the end of the lease period.

122.     On information and belief, FABCO, as a matter of policy, allows landlords to list a rent after move-out charge calculated based upon the full period of a lease before the lease has fully elapsed, and it never follows up with listing landlords about re-renting unless a report is disputed by a consumer.

123.     Additionally, FABCO is well aware of the problem posed by bed bugs and advises landlords to "[a]ct quickly on any bed bug complaint by a resident." *Training for Apartment Staff, Looking for Bed Bugs*, FABCO (*last visited* January 5, 2022), *available at* https://fabcogroup.com/wp-content/uploads/2021/11/BedBug-Training.pdf.

124.     Indeed, FABCO warns landlords that ignoring bed bugs "will increase the cost of extermination, increase the invasiveness of extermination, and increase potential liability." *Id.*

125.     FABCO therefore knew or should have known that the increased extermination costs in this matter arose from 5812's delay in handling the bed bug problem in the Unit.

126.     On or about February 18, 2021, Plaintiff sent a dispute letter to FABCO requesting reinvestigation on, *inter alia*, the following grounds:

   a.     The $75 late fee for March 2020 was impermissible because it was occasioned by retaliatory conduct;

   b.     The $638 for cleaning was impermissible because the items listed included many that had suffered only ordinary wear and tear;

[ 18 ]

      c.     The <u>$645</u> charge for the heat treatment—and by implication the <u>$15</u> charge for the follow-up inspection—were impermissible under Columbus Code of Ordinances § 4551.01, which assigns responsibility for pest elimination in multi-unit dwellings to the landlord;

      d.     The <u>$900</u> "Concession Chargeback" and <u>$2,577</u> in rent after move-out were impermissible because Plaintiff was entitled to terminate the lease under R.C. 5321.07(B)(3) due to 5812 Investment's failure to remedy the bed bug issue.

127.    On March 15, 2021, FABCO responded to the dispute letter by reaffirming all of the impermissible charges listed on its prior report except for the <u>$2,577</u> figure for rent after move-out.

128.    In its response, FABCO stated that 5812 Investment had informed it that the Unit had been re-rented on May 1, 2020.

129.    The Unit was thus re-rented fully one month before the First Statement was generated and provided to FABCO, and 5812 Investment therefore knew the First Statement was inaccurate when it provided the First Statement to FABCO.

130.    FABCO provided alongside its response a second "Final account statement – Revised" (the "Second Statement"), which was identical to the first except that the rent after move-out charge was reduced to <u>$1,403.03</u>.

131.    Notably, <u>$1,403.03</u>, plus the <u>$294.00</u> of pro-rated rent for March 2020 still listed on the Second Statement, equals <u>$1,697.03</u>.

[ 19 ]

132. Because the Unit was re-rented on May 1, 2020, and because 5812 Investment and FABCO both state that Plaintiff was current on rent as of February 29, 2020, 5812 Investment and FABCO must have both known that Plaintiff could not owe more than two times the monthly rent of $811, or a total of $1,622.

133. Furthermore, all other inaccuracies identified in Plaintiff's dispute letter remained in the Second Statement and thus in FABCO's revised consumer report.

134. On information and belief, during its reinvestigation 5812 Investment did not perform basic arithmetic and logical checks on its own calculations.

135. On information and belief, during its reinvestigation 5812 Investment did not question Ms. Dukes, the maintenance staff at the Lake Eden complex, or any other employee(s) who might have had knowledge of the circumstances of the bed bug infestation in the Unit or the origin and treatment thereof.

136. On information and belief, during its reinvestigation 5812 Investment did not reasonably review the photographs taken by Lake Eden maintenance staff after Plaintiff's move-out.

137. On information and belief, FABCO took no steps whatsoever—whether arithmetic or investigatory—to check the accuracy of the figures and associated legal and factual claims provided by 5812 Investment in connection with its reinvestigation.

138. On information and belief, FABCO has a policy of taking no steps whatsoever to check the accuracy of the legal and factual claims and associated figures provided to it by landlords, especially key clients like 5812 Investment.

[ 20 ]

139.    5812 Investment's misleading reporting, combined with FABCO's failure to perform basic checks on its client's initial report and the failure of both to correct initial errors, locked Plaintiff out of the central Ohio housing market, forcing him into an unstable living situation and preventing him from moving forward with his life.

140.    On August 11, 2021, Plaintiff obtained a copy of his credit report as maintained and provided to third parties by Defendant Experian.

141.    Plaintiff's Experian credit report included a derogatory remark for a "Collection" account belonging to FABCO with a value of $3,706—the same incorrect amount detailed in FABCO's response to Plaintiff's dispute to FABCO.

142.    On August 24, 2021, Plaintiff, through counsel, mailed a dispute letter to Experian.  In that dispute letter, Plaintiff explained, *inter alia*, the errors in FABCO's reporting listed in paragraph 122, *supra*, and attached supporting documentation including a full copy of his Experian credit report with the FABCO remark circled.

143.    In this first dispute letter to Experian, Plaintiff provided his first name, last name, middle initial, date of birth, and the last four digits of his social security number. The attached credit report showed Plaintiff's contact information as known to Experian.

144.    Experian received the first dispute letter on August 30, 2021.

145.    On or before October 7, 2021, Plaintiff received Experian's response to his dispute.  In that response, Experian stated "[w]e were unable to honor your recent request because you did not provide sufficient identification".

146.    On information and belief, Experian could, with minimal effort, have located Plaintiff's credit report using the contact information provided and/or the copy of Plaintiff's credit report listing Plaintiff's contact information as known to Experian.

147.    On November 12, 2021, Plaintiff, through counsel, sent a second dispute letter to Experian.

148.    This second dispute letter to Experian included the information in the first letter, plus Plaintiff's middle name, full social security number, and recent addresses.

149.    Experian received the second dispute letter on November 14, 2021.

150.    As of this filing, 55 days have elapsed from Experian's receipt of the second dispute letter, but Experian has so far failed to respond.

151.    On information and belief, Experian continues to and will continue to, unless forced to do otherwise, list the FABCO tradeline on Plaintiff's credit report, including when providing Plaintiff's credit report to prospective landlords and lenders.

152.    Thanks to 5812 Investment's inaccurate reporting and failure to reinvestigate, combined with the inadequate policies and cursory reinvestigations of FABCO and Experian, Plaintiff has remained unable to secure suitable housing for nearly two years.

153.    This action follows.

COUNT I — BREACH OF CONTRACT
(AGAINST DEFENDANTS NEW LIFE AND 5812 INVESTMENT)

154. Plaintiff realleges the paragraphs above as though fully set forth herein.

155. Plaintiff, Ms. Deason, and Defendant New Life signed a residential lease agreement for the Unit on June 14, 2019.

156. Defendant 5812 Investment affirmatively assumed Defendant New Life's obligations under the residential lease no later than December 3, 2019.

157. Until released from their obligations by Defendants' breach, Plaintiff and Ms. Deason performed all of their material obligations under the lease agreement, including paying all rent prior to March of 2020.

158. New Life and 5812 Investment breached the lease agreement:

a. by failing to rid the Unit of bed bugs before renting it to Plaintiff, in violation of their obligations to comply with health and safety codes and to maintain the premises in a fit and habitable condition; or, alternatively,

b. by failing to rid neighboring units and/or common areas of bed bugs, thereby allowing bed bugs to infest the Unit, in violation of the same obligations; and

c. by failing to eliminate the bed bug infestation in the unit once apprised of its existence, in violation of the same obligations; and

      d.     by requiring Plaintiff to pay for the second heat treatment, in violation of their obligation to pay for remediation not occasioned by misconduct on the part of Plaintiff; or, alternatively,

      e.     by refusing to accept Plaintiff's rent payment, on or before March 6, 2021, unless Plaintiff then paid the full price of the second heat treatment, in violation of their obligation to give Plaintiff thirty (30) days to pay the costs of any repairs occasioned by Plaintiff; and

      f.     by attempting, after Plaintiff and Ms. Deason moved out, to charge Plaintiff amounts not permitted under the lease agreement; and

      g.     by engaging in other conduct detailed above.

159.    As a result of Defendants' breach, Plaintiff suffered months of bed bug bites, the loss of his job, the breakdown of his relationship with Ms. Deason, and the loss of his ability to acquire other housing, resulting in physical and mental anguish.

## COUNT II – WRONGFUL WITHHOLDING OF SECURITY DEPOSIT
## (AGAINST DEFENDANT 5812 INVESTMENT)

160.    Plaintiff realleges the paragraphs above as though fully set forth herein.

161.    At the time of move out on March 12, 2020, Defendant 5812 Investment held a $399.00 security deposit belonging to Plaintiff.

162.    The total amount that 5812 Investment was entitled to retain, after deducting improper charges, was less than $399.00.

163.    R.C. § 5321.16 thus provides Plaintiff with a cause of action against 5812 Investment for twice the amount wrongfully withheld plus his reasonable attorney fees.

### COUNT III – BREACH OF IMPLIED WARRANTY OF HABITABILITY
### (AGAINST DEFENDANTS NEW LIFE AND 5812 INVESTMENT)

164.    Plaintiff realleges the paragraphs above as though fully set forth herein.

165.    Defendants New Life and 5812 Investment failed to prevent, mitigate, or remedy the bed bug infestation of the Unit in violation of Columbus City Code of Ordinances § 4551.01 and other applicable health and safety codes and regulations.

166.    New Life and 5812 Investment's failure to prevent, mitigate, or remedy the bed bug infestation in the Unit was so complete, and the resulting hazard to Plaintiff's health was so great, that Plaintiff was constructively evicted from the Unit.

167.    The failures of Defendants New Life and 5812 Investment outlined above otherwise constituted a failure to do what was reasonably necessary to put and keep the premises in a fit and habitable condition.

168.    As a result of Defendants' breach, Plaintiff suffered months of bed bug bites, the loss of his job, the breakdown of his relationship with Ms. Deason, and the loss of his ability to acquire other housing, resulting in physical and mental anguish.

### COUNT IV – VIOLATIONS OF OHIO LANDLORD-TENANT ACT
### (AGAINST DEFENDANTS NEW LIFE AND 5812 INVESTMENT)

169.    Plaintiff realleges the paragraphs above as though fully set forth herein.

170.    At all times relevant hereto, Defendants New Life and 5812 Investment were "Landlords" as defined by R.C. § 5321.01(B) because they were an "owner, lessor, or sublessor of residential premises, the agent of the owner, lessor, or sublessor, or any person authorized by the owner, lessor, or sublessor to manage the premises or to receive rent from a tenant under a rental agreement."

[ 25 ]

171.    At all times relevant hereto, Plaintiff was a "tenant" as defined by R.C. § 5321.01(A) because he and his household members were entitled under a rental agreement to the use and occupancy of the Unit, a residential premises, to the exclusion of others.

172.    At all relevant times hereto, Defendants New Life and 5812 Investment were therefore subject to R.C. Chapter 5321, the Ohio Landlords and Tenants Act.

173.    Defendants New Life and 5812 Investment were required by R.C. § 5321.04(A)(1) to "[c]omply with the requirements of all applicable building, housing, health, and safety codes that materially affect health and safety," which includes Columbus City Code of Ordinances § 4551.01 and other applicable health and safety codes and regulations.

174.    Defendants New Life and 5812 Investment failed to prevent, mitigate, or remedy the bed bug infestation of the Unit in violation of Columbus City Code of Ordinances § 4551.01 and other applicable health and safety codes and regulations.

175.    Defendants New Life and 5812 Investment's failure to prevent, mitigate, or remedy the bed bug infestation in the Unit was a violation of R.C. § 5321.04(A)(2).

176.    Plaintiff has a cause of action under R.C. § 5321.12 for the Defendants' violations of R.C. § 5321.04(A)(2).

177.    These statutory violations also make Defendants New Life and 5812 Investment negligent *per se*.

178.    As a result of Defendants' violations, Plaintiff suffered months of bed bug bites, the loss of his job, the breakdown of his relationship with Ms. Deason, and the loss of his ability to acquire other housing, resulting in physical and mental anguish.

## COUNT V – FCRA FURNISHER LIABILITY
## (AGAINST DEFENDANT 5812 INVESTMENT)

179.    Plaintiff realleges the paragraphs above as though fully set forth herein.

180.    Defendant 5812 Investment violated the FCRA, § 1681s-2(b)(1)(A & B), when, as described in greater detail above, it failed to conduct a reasonable investigation, taking into account all materials provided by FABCO, after it was notified by FABCO of Plaintiff's March 2021 dispute letter.

181.    On information and belief, Defendant 5812 Investment's failure to conduct a reasonable investigation was willful, motivated by a belief that properly investigating complex disputes would cost it more than it is likely to lose in FCRA damages.

182.    A reasonable investigation would have revealed the inaccuracy of FABCO's report, such that FABCO's failure to conduct a reasonable investigation caused Plaintiff's inability to secure new housing and his related injuries.

183.    Plaintiff is therefore entitled to statutory damages of up to $1,000 or his actual damages as proven at trial, plus punitive damages, plus his reasonable costs and attorney fees, as provided for by § 1681n(a)(1)(A), § 1681n(a)(2), and § 1681n(a)(3).

## COUNT VI – FCRA REPORTING LIABILITY
## (AGAINST DEFENDANTS FABCO AND EXPERIAN)

184.    Plaintiff realleges the paragraphs above as though fully set forth herein.

185.    Plaintiff is a "consumer" as defined by § 1681a(c) because he is an individual natural person.

186.    Defendants FABCO and Experian are "consumer reporting agenc[ies]" as defined by § 1681a(f) because they regularly assemble, markets, and sell (directly or by subscription) reports containing information on individual consumers, in particular those consumers' credit, rental, collections, and eviction histories, and because they employ the mails and the internet in doing so.

187.    Plaintiff's February 18, 2021 dispute letter directly informed FABCO that several aspects of its consumer report regarding Plaintiff were inaccurate.

188.    As described in greater detail above, FABCO violated § 1681i(a)(1)(A) by failing to reasonably reinvestigate Plaintiff's dispute and, on information and belief, instead uncritically adopting the position of its furnisher-client 5812 Investment.

189.    Plaintiff's August 24 & November 12, 2021 dispute letters directly informed Experian that FABCO's entry on its credit report for Plaintiff was inaccurate.

190.    As described in greater detail above, Experian violated § 1681i(a)(1)(A) by failing to reasonably reinvestigate in response to Plaintiff's first dispute letter because it unreasonably treated Plaintiff's dispute as frivolous due to an asserted inability to locate Plaintiff's credit file, despite Plaintiff's inclusion with his dispute of a copy of his Experian credit report containing his contact information as known to Experian.

191.    Experian also violated § 1681i(a)(1)(A) by failing to complete its investigation of Plaintiff's November 12, 2021 dispute within thirty (30) days.

192.     In the alternative, Experian also violated § 1681i(a)(6)(A) by failing to notify Plaintiff of its completion of its investigation of Plaintiff's November 12, 2021 dispute within 5 days.

193.     A reasonable investigation would have revealed the inaccuracy of FABCO's report and tradeline, such that Defendants' failures to conduct a reasonable investigations each caused Plaintiff's inability to secure new housing and his related injuries.

194.     On information and belief, FABCO's failure to conduct a reasonable reinvestigation was willful, motivated by its calculation that properly investigating complex disputes would cost it more than it is likely to lose in FCRA damages.

195.     On information and belief, Experian's failure to conduct a reasonable reinvestigation was willful, motivated by its calculation that properly investigating complex disputes would cost it more than it is likely to lose in FCRA damages.

196.     Plaintiff is therefore entitled to statutory damages of up to $1,000 or his actual damages as proven at trial, plus punitive damages, plus his reasonable costs and attorney fees, as provided for by § 1681n(a)(1)(A), § 1681n(a)(2), and § 1681n(a)(3).

### COUNT VII – FCRA PROCEDURES LIABILITY
### (AGAINST DEFENDANTS FABCO AND EXPERIAN)

197.     Plaintiff realleges the paragraphs above as though fully set forth herein.

198.     As described in greater detail above, Defendant FABCO violated § 1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the information contained on Plaintiff's credit report.

199. In particular, FABCO generally does not and did not here:

    a.    Take account of the health and safety ordinances in its own principal place of business when deciding whether to permit a landlord furnisher to assert an extermination debt against a resident consumer;

    b.    Perform basic arithmetic checks on the information provided by the furnisher;

    c.    Check whether a unit has been re-rented before allowing a landlord to list "rent after move-out" for the full lease period;

    d.    Check whether a unit was re-rented during the lease period at any point after allowing a landlord to list "rent after move-out" for the full lease period;

    e.    Question, or require furnishers to question, property managers or others with direct knowledge of material facts alleged in disputes;

    f.    Otherwise question tradelines furnished by major clients like 5812 Investment.

200. Had FABCO maintained any of the above procedures or the other reasonable procedures known to it, it would immediately have recognized 5812 Investment's tradeline as inaccurate, reducing or eliminating the harm to Plaintiff in the form of his inability to obtain housing and related injuries.

201. As described in greater detail above, Defendant Experian violated § 1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the information contained on Plaintiff's credit report.

202. In particular, Experian generally does not and did not here:

    a. Presumptively reject FABCO tradelines based on FABCO's patently inadequate procedures explained above;

    b. Perform basic arithmetic checks on the information provided by FABCO;

    c. On information and belief, maintain consumers' credit files in a format that makes it possible to locate a consumer's credit file using a copy of his or her credit report;

    d. Alternatively, on information and belief, employ the same search methodology when locating a consumer's credit file for a paying customer and when locating the same consumer's credit file in response to a dispute from that consumer.

203. Had Experian maintained any of the above procedures or the other reasonable procedures known to it, it would immediately have recognized FABCO's tradeline was inaccurate and/or would not have rejected Plaintiff's dispute as frivolous, which change would have reduced or eliminated the harm to Plaintiff in the form of his inability to obtain housing and related injuries.

204.     On information and belief, FABCO's failure to follow reasonable procedures was willful, motivated by its calculation that such procedures would cost it more than it is likely to lose in FCRA damages.

205.     On information and belief, Experian's failure to follow reasonable procedures was willful, motivated by its calculation that such procedures would cost it more than it is likely to lose in FCRA damages.

206.     Plaintiff is therefore entitled to statutory damages of up to $1,000 or his actual damages as proven at trial, plus punitive damages, plus his reasonable costs and attorney fees, as provided for by § 1681n(a)(1)(A), § 1681n(a)(2), and § 1681n(a)(3).

COUNT VIII – FDCPA
(AGAINST DEFENDANT FABCO)

207.     Plaintiff realleges the paragraphs above as though fully set forth herein.

208.     Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) of the FDCPA.

209.     Defendant FABCO is a "debt collector" as defined by § 1692a(6) of the FDCPA because the principal purpose of its business is the collection of debts, and because it uses the mails and the internet to do so.

210.     In the alternative, FABCO is a "debt collector" under § 1692(a)(6) because it regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

211.     The subject purported debt is a "debt" as defined by FDCPA § 1692a(5) because it is a debt for family rental housing.

212.     FABCO's March 2021 letter in response to Plaintiff's February 2021 was a communication "in connection with the collection of [a] debt" because it strenuously reaffirmed Plaintiff's indebtedness and included instructions to get on a payment plan.

213.     FABCO's conduct violated several provisions of the FDCPA:

a.     § 1692e(2)(A) by misrepresenting the amount of the debt in the March 2021 letter;

b.     § 1692f(1) by collecting an amount not due in the March 2021 letter;

c.     § 1692e(11) by failing to disclose FABCO's debt collector status in the March 2021 letter; and

d.     § 1692e(10) and § 1692e, generally, by misrepresenting the factual

[ 33 ]

background of the debt in March 2021 letter.

214.    Plaintiff is therefore entitled to statutory damages of up to $1,000, plus

attorney fees, and the proposed class is entitled to statutory damages up to the lesser of

$500,000 or 1% of Defendant's net worth, plus attorney fees, under § 1692k(a).

WHEREFORE, Plaintiff respectfully requests judgment as follows:

**a.**    Awarding Plaintiff actual economic and noneconomic damages in an

amount to be determined at trial for breach of contract, breach of the implied

warranty of habitability, violations of 15 U.S.C. § 1681 et seq., and violations of 15

U.S.C. § 1692 et seq.

**b.**    Awarding Plaintiff statutory damages of $1,000.00 as provided under

15 U.S.C. § 1681n(a)(1)(A).

**c.**    Awarding Plaintiff statutory damages of $1,000.00 as provided under

15 U.S.C. § 1692k(a)(2)(A).

**d.**    Awarding Plaintiff actual damages for his wrongfully withheld security

deposit, plus statutory damages equal to the amount of the security deposit, plus

reasonable expenses and attorney's fees under R.C. 53216.16;

**e.**    Awarding Plaintiff punitive damages for willful breach of the implied

warranty of habitability and as provided under 15 U.S.C. § 1681n(a)(2).

**f.**    Awarding Plaintiff nominal damages;

**g.**    Awarding Plaintiff costs and reasonable attorney fees as provided under

15 U.S.C. § 1681n(a)(3), 15 U.S.C. § 1681o(a)(2), and 15 U.S.C. § 1692k(a)(3); and

**h.** Awarding any other relief as this Honorable Court deems just and appropriate.

**<u>A TRIAL BY JURY IS DEMANDED.</u>**

By:  s/ Geoffrey C. Parker

Geoffrey C. Parker (0096049)
HILTON PARKER LLC
7544 Slate Ridge Blvd.
Reynoldsburg, OH 43068
Tel: (614) 992-2277
Fax: (614) 927-5980
gparker@hiltonparker.com


Patrick W. Skilliter (0079629)
Jacqueline P. Gutter (0079352)
The Legal Aid Society of Columbus
1108 City Park Avenue
Columbus, OH 43206
Ph: 614.737.0140
Fax: 614.224.4514
pskilliter@columbuslegalaid.org
jgutter@columbuslegalaid.org

*Attorneys for Plaintiff Adam Lambert*